UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
UNITED STATES OF AMERICA,
:
       -against-
:
:
JEREMY LAMBERT,
:
                            Defendant.
:
:
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/21/22

21-CR-00585 (VEC)

MEMORANDUM
OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

      Defendant Jeremy Lambert has been charged in two-count indictment with being a felon in possession of ammunition and a felon in possession of a firearm. *See* Indictment, Dkt. 5. Mr. Lambert has moved to suppress all of the evidence obtained from a warrantless search of his person and vehicle that followed a police stop of his vehicle. *See* Not. of Mot., Dkt. 25. The Court held an evidentiary hearing on April 12, 2022, *see generally* Suppression Hearing Tr., Dkt. 36, after which the parties submitted additional briefing, *see* Dkts. 38–40. For the reasons stated below, Mr. Lambert's motion to suppress is DENIED.

## BACKGROUND

      On April 26, 2021, a shooting involving three individuals occurred within the confines of the 47th Precinct in the Bronx. Compl., Ex. A, Dkt. 26-1 ¶¶ 4, 6(a); Suppression Hearing Tr. at 5–9. Surveillance footage showed two men (the "Driver" and the "Passenger") exit a vehicle and approach a pedestrian; the pedestrian drew a firearm and pointed it at the Passenger. Compl. ¶¶ 5–7; Suppression Hearing Tr. at 5–9. The Driver drew his own weapon, and a shootout ensued, during which the pedestrian was wounded. Compl. ¶ 7. The Driver and Passenger fled the scene

in their vehicle. *Id.*; Suppression Hearing Tr. at 6, 10. Officers recovered five shell casings from the immediate vicinity of the vehicle. Compl. ¶¶ 8(a)–(b).

The Vehicle Investigations Group ("VIG") of the New York Police Department ("NYPD") opened a case to identify the vehicle from which the Driver and Passenger emerged. NYPD Report, Ex. C, Dkt. 26-3 at 1. Using surveillance footage from the shootout, VIG Detective Justin Aiello identified the vehicle as a 2005–2010 model Jeep Grand Cherokee with a Pennsylvania license plate. *Id.* at 2. Upon further investigation, Det. Aiello was able to narrow the year range to 2005–2007 and determined that there were 365 vehicles matching the Jeep's characteristics registered in Pennsylvania. *Id.* at 4; *see also* Suppression Hearing Tr. at 56. Det. Aiello then searched the NYPD's Domain Awareness System ("DAS"), which combines all vehicle information available to the NYPD in a single database, including data collected from red light cameras and license plate readers. Ex. C at 4; Suppression Hearing Tr. at 65. He compared the pictures available in DAS to the 365 vehicles he identified and came up with one vehicle that matched the characteristics he had observed in the surveillance footage: Mr. Lambert's Jeep. Ex. C at 4; *see also* Compl. ¶ 9(d); Suppression Hearing Tr. at 67. DAS revealed that a license plate reader on the Whitestone Bridge had captured Mr. Lambert's vehicle traveling from the Bronx to Queens approximately 40 minutes after the shootout on April 26, 2021. Compl. ¶ 9(c); Suppression Hearing Tr. at 68.

On May 29, 2021, Det. Aiello submitted his report identifying Mr. Lambert's Jeep as a "possible match" for the vehicle involved in the shootout, but noting: "Be advised, this is NOT probable cause to arrest, merely a lead." Ex. C at 4.

Relying on Det. Aiello's report, Det. Tracey Treanor, the detective assigned to investigate the shootout, obtained body camera footage from a March 2021 stop of the Jeep Det. Aiello had

identified as a possible match. Suppression Hearing Tr. at 24, 26. From the body camera footage, Det. Treanor determined that the person driving the Jeep that day was a male with long dreadlocks. *Id.* at 27, 29; *see also* Compl. ¶ 6(d). Det. Treanor subsequently activated a suspect investigative card ("I-Card") for Mr. Lambert, notifying other NYPD officers that Mr. Lambert was officially a person of interest in the shootout. Suppression Hearing Tr. at 29.

On July 13, 2021, Detective Edwin Vega was outside the 47th Precinct when he noticed a Jeep that appeared to match the vehicle from the April 2021 shootout. Vega Interview Notes, Ex. D, Dkt. 26-4 at 1; Suppression Hearing Tr. at 100–02. Det. Vega could not see the driver's face because of the Jeep's tinted windows but was able to observe that the driver had long hair. Ex. D at 1; Suppression Hearing Tr. at 102, 104. Det. Vega ran the license plate in the NYPD system and learned that it was, in fact, the car that had been flagged as a vehicle of interest in connection with the shootout. Ex. D at 1; Suppression Hearing Tr. at 107–08. Det. Vega then called Det. Treanor, who confirmed that a male with dreadlocks was the target of her investigation. Ex. D at 1; Suppression Hearing Tr. at 30–31, 108.

Det. Vega then began following the Jeep and observed the driver make a turn without signaling. Ex. D at 1; Suppression Hearing Tr. at 108–09. The driver — later determined to be Mr. Lambert — stopped the car, exited, and made eye contact with Det. Vega. Ex. D at 1; Suppression Hearing Tr. at 109–10. According to Det. Vega, Mr. Lambert then returned to his vehicle and continued driving at upwards of 60 miles per hour on residential streets, committing various other traffic infractions along the way, such as failing to use his turn signal, Ex D. at 1–2; Suppression Hearing Tr. at 112, and running a stop sign, Suppression Hearing Tr. at 112–13. At one point, according to Det. Vega, Mr. Lambert, while in his car, yelled at Det. Vega, who was driving an unmarked car, for following him. *Id.* at 114. After calling for back-up, Det. Vega

activated his lights, and Mr. Lambert pulled over; Det. Vega then stopped behind the Jeep. *Id.* at 117–19; Ex. D at 2.

Once stopped behind Mr. Lambert's vehicle, Det. Vega testified that he could see Mr. Lambert's shoulder in the driver's sideview mirror; based on Det. Vega's training and experience, that indicated to him that Mr. Lambert was leaning forward and putting something under his seat. Suppression Hearing Tr. at 116–17, 123; Ex. D at 2. Det. Vega approached the Jeep and saw that Mr. Lambert had both of his hands outside the window holding his ID. Suppression Hearing Tr. at 118. Det. Vega testified that Mr. Lambert seemed agitated and was not wearing a seatbelt; Det. Vega believed that Mr. Lambert might have a weapon. *Id.* at 118–19. Det. Vega ordered Mr. Lambert out of the car and frisked him while three other occupants in the car remained seated. *Id.* at 120–21. Upon frisking him, Det. Vega felt an empty gun holster on Mr. Lambert's person. *Id.* at 121.[1] Det. Vega then searched the vehicle and found a handgun under the driver's seat. *Id.* at 123. Mr. Lambert was arrested and ballistics later confirmed that the handgun found in the Jeep matched the shell casings found at the scene of the shootout. *Id.*; *see also* Ex. D at 3; Compl. ¶¶ 10(c), 11. Mr. Lambert was brought to the police station where he waived his *Miranda* rights and took full responsibility for the gun. Def. Mem., Dkt. 26 at 6; Compl. ¶ 10(c).[2]

The Court held a suppression hearing on April 12, 2022. *See generally* Suppression Hearing Tr., Dkt. 36. At that hearing, the Government called Dets. Treanor, Aiello, and Vega,

---

[1] Det. Vega made no mention of the frisk or the gun holster in his post-arrest case note, also known as a "DD-5," Gov. Opp., Dkt. 27 at 17 n.3, but did mention the holster when he was speaking to an Assistant U.S. Attorney, Ex. D at 3 (mentioning empty holster). Regardless, the holster was removed from Mr. Lambert's person and vouchered as evidence by the NYPD immediately after his arrest, thus confirming that Mr. Lambert possessed a holster at the time of the encounter. Gov. Opp. at 17 n.3.

[2] Mr. Lambert does not contest the validity of his *Miranda* waiver but argues that his post-arrest statement is a fruit of the purportedly unconstitutional stop and search. *See* Def. Mem., Dkt. 26 at 11.

and Police Officers Nicholas Santomero and Alexis Melo. *Id.* at 4, 43, 99, 164, 187. The Government also presented body camera footage of Mr. Lambert's arrest. *Id.* at 192 (entering into evidence Government Exhibits 121 and 121.1, body camera footage from Officer Melo). At the close of the hearing, Mr. Lambert requested leave to file additional briefing, which the Court granted. *Id.* at 210.

## DISCUSSION

### I. Legal Standard

Because temporary detention of a person during a vehicle stop constitutes a seizure within the meaning of the Fourth Amendment, *see Delaware v. Prouse*, 440 U.S. 648, 653 (1979), a vehicle stop, however brief, must be "reasonable" under the circumstances. It is well-established that a vehicle stop is reasonable "where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996) (citations omitted). The Supreme Court has consistently held that an officer's subjective intent for stopping a vehicle is irrelevant to the reasonableness of the traffic stop, so long as there was a valid, traffic violation-related reason to stop the vehicle. *Id.* at 813.

Pursuant to the automobile exception to the warrant requirement, police "may search an automobile and all the containers within it where they have probable cause to believe contraband or evidence is contained [therein]," *California v. Acevedo*, 500 U.S. 565, 580 (1991) (interpreting *Carroll v. United States*, 267 U.S. 132 (1925)). Even without probable cause, the police are constitutionally permitted: to order passengers out of a vehicle incident to a lawful traffic stop; to frisk the people who are in the vehicle if there is a reasonable belief that they are armed and dangerous; and to conduct a limited search of the passenger compartment to include locations where a weapon may be hidden if they have a reasonable suspicion that one or more of

the persons is dangerous and may gain immediate control of a weapon. *Michigan v. Long*, 463 U.S. 1032, 1047–49 (1983).

When a stop or search has been conducted in contravention of the Fourth Amendment, the exclusionary rule "prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search . . . ." *Murray v. United States*, 487 U.S. 533, 536–37 (1988).

**II.     The Stop of Mr. Lambert's Vehicle Was Lawful**

Mr. Lambert argues that Det. Vega did not have probable cause to stop his vehicle in the first place, asserting that "it is undisputed that Mr. Lambert was not stopped for a traffic violation, but rather for suspected involvement in the April 2021 shooting." Def. Mem. at 6. Mr. Lambert argues that the police did not have sufficient evidence to connect Mr. Lambert or his vehicle to the April 2021 shootout, and, therefore, Det. Vega lacked reasonable suspicion to follow and stop Mr. Lambert. *Id.* at 6–7. The Government contends that Det. Vega had probable cause to stop Mr. Lambert's vehicle because he witnessed Mr. Lambert commit multiple traffic violations. Gov. Mem. at 8.

As noted above, a vehicle stop is reasonable "where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810 (citations omitted). The officer's subjective reason for wanting to enforce traffic laws in the particular incident is irrelevant to the reasonableness evaluation. *Id.* at 813.

Here, Det. Vega's unrebutted credible testimony was that he witnessed Mr. Lambert commit multiple traffic violations prior to stopping him. Suppression Hearing Tr. at 108–13

(describing at least three instances in which Mr. Lambert turned without signaling; one instance in which he ran a stop sign; and the car traveling well over the 25 miles-per-hour speed limit).

Mr. Lambert's argument that the stop was not lawful rests entirely on his claim that Det. Vega is not credible. In support, he points to the following evidence that purportedly impeaches Det. Vega's credibility: a passing reference by a state court judge to inaccurate paperwork that was not authored by Det. Vega in a different case, Def. Supp. Mem., Dkt. 38 at 8–9 (citing Suppression Hearing Tr. at 184–85); several civil rights cases that were brought against Det. Vega that were settled, Suppression Hearing Tr. at 156–62; and Det. Vega's failure initially to relay information about Mr. Lambert's traffic violations to Det. Treanor or to Officers Melo and Santomero, Def. Supp. Mem. at 5–6 (citing Suppression Hearing Tr. at 40, 135–36).[3] Although Mr. Lambert asserts that "Det. Vega's testimony was patently incredible," *id.* at 5, the Court finds otherwise.

The Court finds that Det. Vega's testimony was credible and that he had probable cause to believe that multiple traffic violations had occurred, rendering his subsequent stop of Mr. Lambert reasonable under the Fourth Amendment, regardless of his knowledge of the potential connection between Mr. Lambert and the April 2021 shooting and regardless of any other motive he may have had to stop Mr. Lambert's vehicle. *Whren*, 517 U.S. at 813. Although Mr. Lambert's theory is that Det. Vega was lying about the traffic violations, *see, e.g.*, Suppression Hearing Tr. at 203, there is no evidence before the Court to support that proposition, *see, e.g., id.* at 200 (Court noting that Mr. Lambert "has not put in an affidavit controverting" Det. Vega's testimony regarding the traffic violations).

---

[3] The Court agrees with the Government that Det. Vega's decision not to issue Mr. Lambert a traffic summons after arresting him for possession of a loaded firearm has no bearing on his credibility. Gov. Supp. Opp., Dkt. 39 at 4.

7

Notwithstanding Det. Vega's independent basis to stop Mr. Lambert's vehicle, the Court will address the parties' dispute regarding whether there was probable cause to stop Mr. Lambert based on his potential connection to the underlying shootout. Mr. Lambert's argument turns on the reliability and legality of DAS. In his supplemental briefing, Mr. Lambert argues that, to the extent that the Government is relying on DAS software for probable cause, it "must show the reliability of the software, in part, by establishing the source of the information." Def. Supp. Mem. at 1 (citing *United States v. Thomas*, 788 F.3d 345 (2d Cir. 2015)). According to Mr. Lambert, the Government has made no effort to establish that reliability. *Id.* at 2. Mr. Lambert argues that Det. Aiello's admission that DAS is managed by a separate unit of the NYPD prevented him from providing testimony showing the system's reliability. *Id.* at 2–3 (citing Suppression Hearing Tr. at 36, 77–79). Mr. Lambert also argues that the Government has failed to prove that DAS "is legally acquiring information." *Id.* at 4.

Mr. Lambert's argument that the prosecution failed to prove DAS' reliability, and that it was necessary for it to do so if it is relying on the technology as a basis for probable cause, *id.* at 1 (citing *Florida v. Harris*, 568 U.S. 237 (2018)), is faulty. First, his argument rests on the false premise that evidence collected from DAS was the only basis for Det. Vega's stop (putting aside the traffic violations). DAS was used only by Det. Aiello, and he used it only in an attempt to identify the Jeep involved in the underlying shootout. Gov. Supp. Opp., Dkt. 39 at 1; Suppression Hearing Tr. at 65. Det. Aiello testified at the hearing that he used data from the surveillance video of the shootout to identify the Jeep's specific characteristics; he then identified every Jeep that had been issued a traffic ticket in New York City in the past year and matched the characteristics of those Jeeps to the one he had seen on the surveillance video of the shoot out; he then used DAS to review photographs of the matching Jeeps, during which he

learned of Mr. Lambert's Jeep. Suppression Hearing Tr. at 53–67. Det. Treanor testified that, upon reviewing the report that Det. Aiello created, which was in part based on information stored in DAS, and body camera footage from a separate, prior traffic stop of Mr. Lambert's Jeep (the prior stop occurred because the operator of the vehicle was using a phone while operating the vehicle), she identified a man with long hair driving the Jeep and registration stickers that matched those identified by Det. Aiello. *Id.* at 26–29.

Although data stored in DAS were essential to paring down the number of Jeeps that could be the Jeep involved in the shootout, the use of DAS was in conjunction with body camera footage reviewed by Det. Treanor, as well as a flyer that Det. Treanor circulated with a still photo of the Jeep taken from surveillance video of the shootout. Gov. Supp. Opp. at 1–2 (citing Suppression Hearing Tr. at 17–18). In other words, data stored in DAS were not the sole basis for officers on the scene to believe that the Jeep they stopped was the Jeep that was involved in the shootout. *Id.*; *see also*, *e.g.*, Suppression Hearing Tr. at 167 (Officer Santomero testifying that he recognized the green Jeep from Det. Traynor's flyer and the surveillance video).

But even if information collected in DAS were the only basis for the analysis that led to the stop of Mr. Lambert's car, *Harris* would not counsel that the evidence must be suppressed because DAS has not been "validated." As the Court understands it, DAS is simply a database that collects in one place data that are collected from many different sources regarding vehicles. The primary data from DAS that Det. Aiello relied on were from license plate readers on a public bridge and DMV data regarding licensed vehicles, data over which there is no right to privacy. *See United States v. Miller*, 425 U.S. 435, 443 (1976); *Smith v. Maryland*, 442 U.S. 735, 745 (1979). In short, a cumulation of data is not the sort of "technology" that suffers from reliability

9

problems. A better analogy than *Harris*, which addressed the reliability of a drug-sniffing dog,[4] would be *United States v. Thomas*, 788 F.3d 345, 352 (2d Cir. 2015). In that case, the defendant argued that the Government failed to establish the reliability of Child Protection System ("CPS") software, because no certification or testing similar to that done in *Harris* had been conducted on it. *Id.* The software at issue aggregated Internet Protocol addresses that were known to be associated with sharing files that contained child pornography on peer-to-peer networks, *id.* at 352 n.11 (citations omitted); the Second Circuit held that the reliability challenge failed because "the aggregation of public information . . . [is] a task that could otherwise be performed manually by law enforcement, albeit at a slower and less efficient pace," and does not implicate similar concerns to dog training, which contains numerous steps and is more "susceptible to error," *id.* at 352. Like the CPS software at issue in *Thomas*, DAS is essentially an automated aggregation of files, which could be maintained manually but less efficiently. In other words, police use of DAS does not implicate reliability issues that other technology might.

For all of those reasons, the Court finds that the police stop of Mr. Lambert was lawful.

### III. The Search of Mr. Lambert's Vehicle Was Lawful

Following the lawful stop of Mr. Lambert's vehicle, the subsequent search of his vehicle can be justified either under the automobile exception or as a *Terry* stop and frisk. The Court finds that there was no probable cause to believe the gun from the shootout would be found in the Jeep and that, therefore, the automobile exception does not apply, but that the police

---

[4] In *Harris*, the Supreme Court held that the certification and training of a drug-sniffing dog were sufficient to presume that the dog's alert to potential drugs provided probable cause to search under the Fourth Amendment, while emphasizing that the flexible, common-sense standard for probable cause applies to the determination of the reliability of a source of information. 568 U.S. at 240, 244–45.

nonetheless had reasonable suspicion to frisk Mr. Lambert and to conduct a limited search of the passenger compartment of the Jeep.

### A. The Automobile Exception Does Not Apply to the Search of Mr. Lambert's Vehicle

In order to invoke the automobile exception, Det. Vega must have had probable cause to believe that there was contraband in the vehicle. *Acevedo*, 500 U.S. at 580. Probable cause to search a vehicle exists when the totality of the circumstances indicates a "fair probability that contraband or evidence of a crime will be found in" the vehicle. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause is a "fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules." *Id*. at 232. Although probable cause is focused on "probabilities, not hard certainties," it requires more than a mere suspicion of wrongdoing. *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (cleaned up). Probable cause "must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers." *United States v. Ross*, 465 U.S. 798, 808 (1982). At the same time, courts recognize that "experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not." *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004). In such cases, courts must view the circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Price*, 599 F.2d 494, 501 (2d Cir. 1979).

Mr. Lambert argues that the automobile exception does not render lawful Det. Vega's search because Det. Vega lacked probable cause to believe evidence of the April 2021 shootout — namely, the gun — would be found in Mr. Lambert's vehicle. Def. Mem. at 7–11. First, Mr. Lambert posits that it was unreasonable to believe that the car would contain evidence of the April 26, 2021 shootout 78 days later, on July 13, 2021. *Id*. at 8. Mr. Lambert contrasts this case

with *United States v. Babilonia*, where, as part of an ongoing drug trafficking investigation, police officers observed the defendant look up and down the street repeatedly, enter an apartment where officers suspected drug transactions were occurring, exit the apartment with a bag appearing to contain a large brick-shaped object, and enter his car, at which point a high-speed chase ensued, culminating in the stop and search of defendant's car. 854 F.3d 163, 171 (2d Cir. 2017). The Second Circuit upheld the warrantless search of the car in that case, *see id.*, and Mr. Lambert argues that his case is distinct from *Babilonia*. He points out that he was not engaging in suspicious behavior such as looking up and down the street prior to Det. Vega's decision to follow him, nor did officers witness Mr. Lambert carrying a weapon prior to the stop and search. Def. Mem. at 9–10. Finally, Mr. Lambert points out that law enforcement had plenty of time to acquire a warrant in this case, and suggests that their failure to do so indicates "their own concern that there was insufficient evidence to establish probable cause to support a warrant." *Id*. at 11.

The Government contends that *Babilonia* is not instructive because the quantum of evidence in that case does not set the threshold for probable cause, Gov. Opp. at 16, a point with which this Court agrees. But the Government also argues that the passage of time between the shooting and the stop did not diminish officers' probable cause to believe that evidence of the shootout would likely be found inside Mr. Lambert's vehicle. *Id*. at 17. In support of that argument, the Government cites several circuit court cases which upheld the validity of warrants despite the fact that they were executed weeks or months after being issued. *See* Gov. Opp. at 16–17 (collecting cases). Those cases generally stand for the proposition that probable cause supporting a warrant is not *destroyed* solely because some time has passed between the issuance of the warrant and the warrant's execution. *See*, *e.g.*, *United States v. Beltempo*, 675 F.2d 472,

478–79 (2d Cir. 1982). The Government argues that it was "reasonable to think that evidence of a gun crime would be found in a car driven by a defendant who was suspected of having used that car to commit a gun crime a few months prior." *Id*. at 17. Finally, the Government argues that the fact law enforcement did not obtain a warrant despite having the time to do so is irrelevant to the probable cause inquiry. Gov. Opp. at 17 (citing *United States v. Howard*, 489 F.3d 484, 495 (2d Cir. 2007)).

The relevant question before the Court is whether Det. Vega, in light of his experience and training, had sufficient facts before him to make the discovery of evidence of the shootout in Defendant's car probable. *Walczyk*, 496 F.3d at 157. The Court does not believe he did. It is true that, immediately after the shootout, if Mr. Lambert was in fact the shooter, he would have had the gun with him in the Jeep. But the police had absolutely no facts from which they could reasonably conclude that Mr. Lambert had probably decided to store the gun in the Jeep for months or that he probably was, as a routine matter, carrying a gun on his person. If the Jeep had been stopped within hours, or maybe even within a day or two of the shootout, the police might have had probable cause to believe the gun was in the car, but that is very different from a stop two months after the shootout. As a result, the Court finds that the automobile exception does not apply to the search of Mr. Lambert's Jeep.

### B. Det. Vega Had Reasonable Suspicion to Believe a Weapon Was in the Vehicle

Although the Government cannot properly invoke the automobile exception, the Court finds that the search of Mr. Lambert's car was proper pursuant to *Terry v. Ohio*, 392 U.S. 1, 30 (1968). To conduct a lawful stop and frisk, an officer must have independent grounds for both the stop and the frisk — that is, he must have reasonable suspicion to support the stop, and he must have reasonable suspicion that the individual is armed to support the frisk. *Sibron v. New*

*York*, 392 U.S. 40, 64 (1968).  The officer must be able to point to "specific and articulable facts which, taken together with the rational inferences from those facts," reasonably warrant the officer suspecting that the individual is armed and dangerous.  *Terry*, 392 U.S. at 21.

In the traffic stop context, law enforcement may, as a matter of course, order the driver and passengers out of the vehicle pending completion of the stop.  *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *Maryland v. Wilson*, 519 U.S. 408, 415 (1997).  When an officer orders individuals out of their car during a traffic stop, he may "frisk those persons for weapons if there is a reasonable belief that they are armed and dangerous."  *Long*, 463 U.S. at 1047–48 (citing *Mimms*, 434 U.S. at 111–12).  Officers may also "conduct an area search of the passenger compartment to uncover weapons, as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous."  *Id.* at 1051.

The Government initially argues that Det. Vega was justified in conducting a limited search of the vehicle to protect officer safety, appearing to conflate reasonable suspicion for the frisk with reasonable suspicion for the search of Mr. Lambert's vehicle.  Gov. Opp. at 14–15 (asserting that Det. Vega had reasonable suspicion to search the car because he felt a holster on Defendant's person).  Undoubtedly, once Det. Vega felt the empty gun holster on Mr. Lambert's person, he had a reasonable and objective basis for suspecting that the car might contain a gun, and was justified in conducting a search of the passenger compartment for weapons.  *Long*, 463 U.S. at 1047–48 (citing *Mimms*, 434 U.S. at 111–12).  The question, however, as the Court raised at the evidentiary hearing, *see* Suppression Hearing Tr. at 215–16, is whether Det. Vega had reasonable suspicion to believe that Mr. Lambert was armed and dangerous to support a frisk in the first place.

The Government must be able to point to "specific and articulable facts which, taken together with the rational inferences from those facts," reasonably warrant Det. Vega's suspicion that Mr. Lambert was armed and dangerous. *Terry*, 392 U.S. at 21. "[N]ervous, evasive behavior" is a pertinent factor in the reasonable suspicion analysis. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). At the time of the frisk, Det. Vega was aware of the following facts: the car and its driver were suspected of being involved in a shootout three months prior, Suppression Hearing Tr. at 101, 107–08; the driver exited his vehicle to see who was following him, *id.* at 109; the driver sped away and was driving erratically, *id.* at 113; and the driver appeared to bend down and reach under his seat upon being stopped by the police, *id.* at 116–17. The totality of those circumstances reasonably led to the rational inference that Mr. Lambert was likely armed. *See also* Gov. Supp. Opp. at 6–7 (listing Det. Vega's observations of Mr. Lambert). While Mr. Lambert's argument that it is unreasonable to believe the weapon from the shootout would be found months later in the car has merit, the fact that Det. Vega witnessed Mr. Lambert engage in nervous, evasive behavior, together with Det. Vega's knowledge of the ongoing investigation and with him seeing Mr. Lambert appear to place something under the driver's seat after he was stopped, is sufficient to establish reasonable suspicion that Mr. Lambert was armed and dangerous. *Wardlow*, 528 U.S. at 124. Although the Court credits Mr. Lambert's point that there was no bulge on Mr. Lambert's person and that the officers at the scene did not see Mr. Lambert brandish or hold a weapon, Def. Supp. Mem. at 10 (citations omitted), a reasonable suspicion that a stopped individual is armed and dangerous does not require that quantum of evidence.[5]

---

[5] Mr. Lambert suggests that the fact that the responding officers did not draw their weapons or have their hands resting on them when they approached Mr. Lambert undermines a finding of reasonable suspicion. Def. Supp. Mem. at 12 (citations omitted). The Court is mindful of the importance of the police not escalating

Because Det. Vega had reasonable suspicion to believe that Mr. Lambert was armed and dangerous, he was justified in frisking Mr. Lambert's person for weapons.

Turning to the search following the frisk, although Mr. Lambert argues that Det. Vega's testimony that he felt a holster is "incredible", Def. Supp. Mem. at 13; *see also* Suppression Hearing Tr. at 204, the Court finds his testimony to be credible. The fact that Det. Vega did not document the discovery of the holster in his initial notes does not change the fact that the holster was removed from Mr. Lambert's person and vouchered as evidence by the NYPD immediately after his arrest. Gov. Opp. at 17 n.3. Det. Vega's lack of memory whether the holster had a clip, and his failure to inform his colleagues that he had felt the holster, similarly do not change the balance of his credibility in testifying that he found the holster on Mr. Lambert's person. Def. Supp. Mem. at 13–14 (citing Suppression Hearing Tr. at 153–54). From reviewing the body camera footage, listening to Det. Vega's testimony, and observing and feeling the holster at the evidentiary hearing, *see* Suppression Hearing Tr. at 222 (the Court noting that the feel of the holster is distinct from the feeling of clothing), it is clear to the Court that Det. Vega's frisk of Mr. Lambert enabled him to feel the presence of the holster on Mr. Lambert's person. Once he felt the empty gun holster on Mr. Lambert's person, Det. Vega had reason to believe that the car might contain a weapon; it was, therefore, reasonable for Det. Vega to conduct a limited search of the passenger compartment of the car, where he ultimately discovered the gun. *Long*, 463 U.S. at 1051.

---

interactions with civilians, Gov. Supp. Opp. at 7, and does not find this fact to be determinative, although it does cut in Defendant's favor.

IV.     **Because There Is No Poisonous Tree, No Evidence Can Be Excluded as Fruit of the Poisonous Tree**

Mr. Lambert argues that evidence collected as a result of the stop and search of him and his vehicle, including his post-arrest statement, should be excluded as fruit of the poisonous tree. Def. Mem. at 11–12. Because no Fourth Amendment violation occurred, *see supra* Sections II–III, no evidence is subject to suppression on that basis.

## CONCLUSION

For the foregoing reasons, Mr. Lambert's motion is DENIED. The parties are ordered to appear for a status conference in **Courtroom 443**, Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, NY 10007 on **Tuesday, July 26, 2022, at 4:45 p.m.**, during which the Court will set a trial date.

The Clerk of Court is respectfully directed to close the open motion at Docket 25.

**SO ORDERED.**

Date: July 21, 2022  
New York, NY

_____  
**VALERIE CAPRONI**  
**United States District Judge**